IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SCOTT PETERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 3:17-CV-852-MAB |
| ) | |
| JOHN BALDWIN and ) | |
| ILLINOIS DEPARTMENT OF ) | |
| CORRECTIONS, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on the Motion for Summary Judgment on the Issue of Exhaustion filed by Defendants John Baldwin and the Illinois Department of Corrections on October 28, 2019 (Doc. 99). For the reasons stated below, the motion is granted in part and denied in part.

BACKGROUND

Plaintiff Scott Peters is an inmate in the Illinois Department of Corrections ("IDOC"), currently confined at Menard Correctional Center. He filed this lawsuit on August 10, 2017, alleging that the IDOC deprived disabled "ADA inmates" who are confined to wheelchairs from participating in certain programs, activities, and opportunities that are available to inmates who are not disabled (Doc. 1, Doc. 7). The operative complaint in this matter is the consolidated complaint filed on May 10, 2019 by Plaintiff's recruited counsel, Jonathan Garside (Doc. 82). Plaintiff asserts an ADA/Rehab

Act claim against the IDOC and John Baldwin on behalf of himself and a class of inmates "with mobility issues . . . who require accommodations, including a wheelchair, to get around the IDOC facilities" (Doc. 82). It alleges, in short, that the IDOC does not allow wheelchair-bound inmates to participate in or access the cafeteria, the gym, school and educational programs, summer night yard, and MP3 player kiosks (*Id.*). It further alleges that the IDOC does not allow inmates to use assistive devices, such as crutches or wheelchairs, in their cells or on the yard (*Id.*). The Court notes that all of these allegations were asserted in the original complaint in this matter (*see* Doc. 1).

On October 28, 2019, Defendants filed a motion for summary judgment, arguing that Plaintiff failed to exhaust his administrative remedies prior to filing this lawsuit (Doc. 100). According to Defendants, there are three relevant grievances that Plaintiff fully exhausted prior to filing this lawsuit, which were dated April 21, 2016, April 22, 2016, and April 29, 2017 (Doc. 100). Defendants argue that none of these grievances mention the programs or facilities that Plaintiff alleges he was deprived access to (Doc. 100, pp. 4–5; 6–7).

Plaintiff filed a response in opposition to the motion for summary judgment on December 11, 2019 (Doc. 104). He argues that the three grievances identified by Defendants cover more than what they claim (Doc. 104). He further argues that he submitted five other grievances that address his claims in this lawsuit: a second grievance dated April 21, 2016 (Doc. 104-2), and grievances dated July 11, 2016 (Doc. 104-5), March 26, 2017 (Doc. 104-6), and May 30 and June 30, 2017 (Doc. 104-7). Defendants did not file a reply brief.

The Court held a hearing on the motion for summary judgment on March 5, 2020 (Doc. 113). Counsel for all parties agreed there were no issues of fact, and so there was no witness testimony; the Court only heard arguments from the attorneys.

## **LEGAL STANDARDS**

*Summary Judgment*

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In making that determination, the court must view the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted). Courts generally cannot resolve factual disputes on a motion for summary judgment. *E.g., Tolan v. Cotton*, 572 U.S. 650, 656, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014) ("[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.") (internal quotation marks and citation omitted). However, when the motion for summary judgment pertains to a prisoner's failure to exhaust, the Seventh Circuit has instructed courts to conduct an evidentiary hearing and resolve contested issues of fact regarding a prisoner's efforts to exhaust. *Wagoner v. Lemmon*, 778 F.3d 586, 590 (7th Cir. 2015) (citing *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008)). *Accord Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014). No hearing is necessary when there is no disputed issue of fact.

*Exhaustion*

The Prison Litigation Reform Act provides that a prisoner may not bring a lawsuit

about prison conditions unless and until he has exhausted all available administrative remedies. 42 U.S.C. § 1997e(a); *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011)). The primary purpose of the exhaustion requirement is to give prison officials notice of a problem and a chance to correct it before they are subjected to a lawsuit. *Turley v. Rednour*, 729 F.3d 645, 649 (7th Cir. 2013) ("The exhaustion requirement's primary purpose is to alert the state to the problem and invite corrective action.") (internal quotation marks and alterations omitted; citation omitted); *Maddox v. Love*, 655 F.3d 709, 721 (7th Cir. 2011) ("Grievances are intended to '[allow prisons] to address complaints about the program it administers before being subjected to suit . . . .'" (quoting *Jones v. Bock*, 549 U.S. 199, 219 (2007)).

In order for a prisoner to properly exhaust his or her administrative remedies, the prisoner must "file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002); *see also Woodford v. Ngo*, 548 U.S. 81, 90 (2006). As an inmate in the IDOC, Plaintiff was required to follow the grievance process outlined in the Illinois Administrative Code to exhaust his claims. The grievance procedures were amended, effective April 1, 2017. *See* 41 Ill. Reg. 3909–10 (March 31, 2017) (amending 20 Ill. Admin. Code § 504.810). Some of Plaintiff's grievances were filed before this date, and some after. Consequently, both version of the Code will be discussed here.

For non-emergency grievances, the IDOC has a three-step process that prisoners are required to follow in order to exhaust administrative remedies. At step one, the prisoner must first attempt to resolve the dispute through his or her counselor. 20 ILL.

ADMIN. CODE § 504.810(a) (2003); 20 ILL. ADMIN. CODE § 504.810(a) (2017). If the counselor is unable to resolve the grievance, it is sent to the grievance officer. *Id.* at § 504.810(a)–(b) (2003); *Id.* at § 504.830 (2017). The grievance officer then considers the grievance and reports his or her findings and recommendations to the Warden, who then issues a written decision. *Id.* at § 504.830(e) (2003); *Id.* at § 504.830(e) (2017). If the inmate is still unsatisfied, he can appeal to the Director of the IDOC via the Administrative Review Board ("ARB"). *Id.* at § 504.850(a) (2003); *Id.* at § 504.850(a). The ARB submits a written report of its findings and recommendations to the Director, who then makes a final determination. *Id.* at § 504.850(b), (d), (e) (2003); *Id.* at § 504.850(d), (e) (2017).

An inmate may also request that a grievance be handled as an emergency by forwarding the grievance directly to the warden. 20 ILL. ADMIN. CODE § 504.840 (2003); 20 ILL. ADMIN. CODE § 504.840 (2017). If the warden determines the grievance involves an emergency—which is defined as a "substantial risk of imminent personal injury or other serious or irreparable harm to the offender"—the grievance is handled on an expedited basis. *Id.* at § 504.840 (2003); *Id.* at § 504.840 (2017). If the prisoner is unsatisfied with the warden's expedited decision, he can appeal to the ARB. *Id.* at § 504.850(a), (g) (2003); *Id.* at § 504.850(a), (f) (2017).

On the other hand, if the warden determines that the grievance *does not* involve an emergency, the amended version of the Code dictates that the inmate must resubmit the grievance through the normal grievance process. 20 ILL. ADMIN. CODE § 504.840(c) (2017). The version of the Code that existed before the 2017 amendment, however, did not expressly address how things were supposed to proceed. *See* 20 ILL. ADMIN. CODE §§

504.840, 504.850 (2003). But the Seventh Circuit has held that an Illinois inmate who filed an emergency grievance did not need formally to resubmit his complaint as an ordinary grievance if the warden concluded that it did not present an emergency, nor did the inmate need to appeal the warden's non-emergency determination to the ARB. *Williams v. Wexford Health Sources, Inc.*, 957 F.3d 828, 833 (7th Cir. 2020); *see also Bentz v. Ghosh*, 718 Fed.Appx. 413, 418 (7th Cir. 2017) (unpublished); *Cobian v. McLaughlin*, 717 Fed.Appx. 605, 611 (7th Cir. 2017) (unpublished); *Boyce v. Illinois Dep't of Corr.*, 661 Fed.Appx. 441, 443 (7th Cir. 2016) (unpublished).

### FINDINGS OF FACT & CONCLUSIONS OF LAW

The Court must determine whether the grievances introduced by the parties were fully exhausted before Plaintiff filed this lawsuit, and if so, whether the grievances sufficiently cover the issues set forth in the consolidated complaint.

The Court will begin with the grievances that were not fully exhausted before Plaintiff filed suit.

1. An **emergency grievance dated March 26, 2017** (grievance #117-5-17) (Doc. 104-6). The warden did not receive this grievance until April 6th (*Id.*). (There is no evidence in the record as to when Plaintiff actually submitted this grievance.) The warden determined that an emergency was *not* substantiated and instructed Plaintiff to resubmit the grievance in the normal manner (*Id.*). Plaintiff did so and the grievance was ultimately denied by the warden on June 9, 2017 (*Id.*). ARB records submitted by Defendants indicate that Plaintiff's appeal was received by the ARB on July 27, 2017 (Doc. 100-3, p. 2). Neither party submitted any evidence as to when the ARB issued its decision, particularly whether it was before Plaintiff filed suit two weeks later on August 10, 2017 (*see* Doc. 100, Doc. 104). Furthermore, Plaintiff conceded that this grievance was not exhausted before he filed suit (Doc. 104, p. 2).

2. A **grievance dated May 30, 2017** (grievance 137-7-17, #1) (Doc. 100-5,

pp. 44–48; Doc. 104-7). This grievance was ultimately denied by the warden on August 8, 2017 (Doc. 100-5, p. 45). Plaintiff appealed to the ARB, who issued a decision denying Plaintiff's appeal on September 5, 2017 (Doc. 100-5, p. 44)—approximately one month after Plaintiff had filed suit (Doc. 1). Plaintiff conceded that this grievance was not exhausted before he filed suit (Doc. 104, p. 2).

3. A **grievance dated June 30, 2017** (grievance 137-7-17, #2), (Doc. 100-5, pp. 44–48; Doc. 104-7). This grievance was handled in conjunction with the previous grievance and denied by the warden on August 8, 2017 (Doc. 100-5, p. 45). Plaintiff appealed to the ARB, who issued a decision denying Plaintiff's appeal on September 5, 2017 (Doc. 100-5, p. 44)—approximately one month after Plaintiff had filed suit (Doc. 1). Plaintiff conceded that this grievance was not exhausted before he filed suit (Doc. 104, p. 2).

Because these three grievances were not fully exhausted before Plaintiff filed suit, they cannot be used to exhaust Plaintiff's claims and will not be considered by the Court. That leaves the Court to consider the following five grievances, which as explained further below, were fully exhausted.

1. An **emergency grievance dated April 21, 2016** (grievance #16-5-16), which was fully exhausted (Doc. 100-2, pp. 14–19; Doc. 104-3). In this grievance, Plaintiff complained that he was housed for fourteen days in the West House. During that time, he claimed that he was forced to crawl on the floor to get around his cell; had no sheets, blankets, showers, extra clothing, or socks; and was not provided food except for breakfast because that is the only meal served in the cell. He was then "transferred to medical," where he remained at the time he filed this grievance. He claimed things "got worse" when he got to medical, and he said "still no blanket, movement, showers, medication, and no way to leave the cell because of my handicaps. This has gone on 42 days now." The decision denying the grievance explained that Plaintiff claims he cannot walk, but he refuses to go to nurse sick call, to have x-rays taken, or be examined by the doctor. Consequently, prison officials are unable to determine if he is disabled and/or entitled to ADA accommodations.

2. Plaintiff argues and Defendants do not dispute that he submitted a **second emergency grievance dated April 21, 2016** (grievance #21-5-16),

which the records show was fully exhausted (Doc. 104-2). In the grievance, Plaintiff complained that when he was removed from segregation (on an unspecified date), he was dragged down the hall by his handcuffs and leg irons. Correctional officers finally brought a wheelchair and he was then taken "outside downstairs into a place they called property," where the officers threw him out of the wheelchair, beat him, placed a plastic bag over his head to suffocate him, and threatened him. He was then taken to a cell and dumped on the floor. He had the top bunk (but eventually got the bottom bunk). He could not leave the cell and so the only meal he got was breakfast. He could not go to the shower, the yard, the library, "nothing" for 35 days total. The grievance was denied because Plaintiff's claims about the abuse could not be substantiated and because he missed or refused to attend medical appointments to evaluate his purported disabilities.

3. An **emergency grievance dated April 22, 2016,** (grievance #17-5-16), that was fully exhausted (Doc. 100-2, pp. 20–23; Doc. 104-1). In this grievance, Plaintiff complained that when he was moved from West House to the Health Care Unit, his legal documents and personal property were taken away. He asked when he could get them back, and the correctional officer said "when you walk or else [they're] locked up for 30 days." He claimed he was put in a cell without a wheelchair and, because the cell was not ADA-compliant, he had to sleep on the floor by the toilet and crawl in order to move around. He complained that the exhaust fan was noisy, the temperature was only 58 degrees, the lights were on all night, and an officer withheld his food. He likened it to a concentration camp in Nazi Germany and believed that he was placed there in order to inflict psychological and mental distress. The grievance was denied because correctional officers denied mistreating Plaintiff and because Plaintiff refused to attend medical appointments to evaluate his claims of disability.

4. Plaintiff argues and Defendants do not dispute that he submitted an **emergency grievance dated July 11, 2016** (grievance #28-8-16) (Doc. 104-5; *see also* Doc. 100-4, p. 17). Plaintiff states that this grievance was not exhausted prior to filing suit (Doc. 104, p. 2). It appears to the Court, however, that the opposite is likely true. This grievance was originally filed as an emergency grievance in 2016 before the grievance procedures were amended. Therefore, after the warden determined that it was not an emergency, Plaintiff was not required to appeal the warden's determination to the ARB or resubmit it through the normal grievance process. The grievance was thus fully exhausted after the warden decided it was not based on an emergency.

In this grievance, Plaintiff complains that "I continue to be denied being brought to the yard. I continue to be punished by being contained in my cell 24/7." He asks "to have the same privileges as any other person and be allowed to go to yard as I have in the past or as others have been able to previously." The warden determined that an emergency was not substantiated. Plaintiff then submitted it to his counselor to proceed through the normal grievance process. The grievance was investigated, and the cellhouse sergeant stated that Plaintiff was being provided access to a wheelchair for yard and was currently going to yard. The ADA Coordinator indicated that ADA accommodations had already been made and Plaintiff was being provided use of a wheelchair. Consequently, this grievance was denied by the warden on Aug. 15, 2016. There is no indication in the records that Plaintiff appealed this grievance to the ARB (*see* Doc. 104-5; Doc. 100-3, pp. 2–3).

5. The parties agree that Plaintiff submitted an **emergency grievance dated April 29, 2017** (grievance #26-5-17), that was fully exhausted (Doc. 100-2, pp. 3–13; Doc. 104-4). In this grievance, Plaintiff complained that he was denied a shower two days prior because he could not get from his bed to the wheelchair positioned at the door of his cell, and the wheelchair could not be brought into the cell because it did not fit through the door as the cell is not ADA-compliant. He stated that he was also denied a shower on April 6th "because I'm handicapped and couldn't walk to the shower." He further indicated that he's complained about the toilet, bed, and mattress many times. He stated he's been told many times that he would be taken care of, but his ADA grievances continue to be thrown away. In the section designated "Relief Requested," Plaintiff wrote, "Because of my disability, I am being denied or excluded access to programs services or benefits and have been subjected to discrimination in programs, services or activities as a result of my disability and I want these shortcomings corrected or [a] transfer." The decision denying the grievance indicated that Plaintiff was not on ADA status and did not have a wheelchair per court order or a wheelchair permit. He had permits for low gallery, low bunk, feed in cell, and "may go to yard." Plaintiff was told he had to request to be evaluated by a physician regarding his ADA concerns, including a wheelchair request.

The Court must now decide whether these five exhausted grievances cover the claims raised in the Consolidated Complaint.

**Assistive Devices:** The complaint alleges that "IDOC policies and procedures do not allow for the use of walking assistive devices. Thus, the Plaintiffs are expected to crawl about their cells and in many instances, have hurt themselves falling while getting around IDOC facilities" (Doc. 82).

Plaintiff complained in both grievances dated April 21, 2016 and the grievance dated April 22, 2016—all of which were fully exhausted—that he was forced to crawl around his cell in the West House and the health care unit. In the April 29, 2017 grievance, Plaintiff complained that he was denied a shower because he could not transfer from his bed to the wheelchair in the door of his cell. Plaintiff also stated he was denied a shower because "I'm handicapped and could not walk to the shower." The Court believes these complaints are sufficient to alert the prison that Plaintiff was unable to move about his cell or the facility. Accordingly, this issue was sufficiently exhausted prior to filing suit.

**Cafeteria**: The complaint alleges that the IDOC refuses to allow mobility-impaired persons who need to use wheelchairs to participate in meals in the cafeteria with the general population. "The IDOC forces the Plaintiffs to eat meals in their cells. In the summer, the general population eats meals outside, while the Plaintiffs eat in their cells" (Doc. 82). At the hearing, Plaintiff's attorney clarified the nature of Plaintiff's complaint regarding the cafeteria. He said the cafeteria is not wheelchair accessible and therefore wheelchair-bound inmates are forced to eat all of their meals in their cells by themselves. Plaintiff wants to eat his meals in the same communal setting as the non-disabled inmates in general population.

In both grievances dated April 21, 2016 and the grievance dated April 22, 2016, Plaintiff complains that he could not leave his cell and the only meal that was brought to him was breakfast. These grievances can only be fairly read as a complaint that officers were not following the policy of feeding a mobility-disabled inmate in his cell. Nothing in the grievances suggests that Plaintiff is complaining about the policy itself. The March 26, 2017 grievance contains a complaint about disabled inmates not being allowed to go to the cafeteria, but that grievance was not exhausted before Plaintiff filed suit. Consequently, this issue was *not* exhausted prior to filing suit.

**School and Educational Programs:** The complaint alleges that the IDOC refuses to allow mobility-impaired persons who need to use wheelchairs to participate in school and educational programs. "All classrooms are on the second floor of Menard, which is not equipped for the Plaintiffs to reach that floor. As a result, the Plaintiffs are not able to participate in school programs" (Doc. 82).

This claim is *not* exhausted because none of the grievances discussed above complain about not being able to access school or educational programs. Plaintiff tries to save this claim by arguing that it is covered by the April 29, 2017 grievance and the May 30, 2017 grievance (Doc. 104, p. 7). The May 30th grievance, however, was not exhausted before Plaintiff filed suit and therefore cannot be used to exhaust his claims. The April 29th grievance is mainly aimed at Plaintiff's lack of access to the showers. But in the "Relief Requested" section, Plaintiff makes the general assertion that he was "being denied or excluded access to programs services or benefits and [had] been subjected to discrimination in programs, services or activities as a result of my disability" (Doc. 100-

2, pp. 3–13). This statement is far too vague to give Defendants notice that Plaintiff is complaining about not being able to attend school and educational programs on the second floor of the school building. Consequently, this issue was *not* exhausted prior to filing suit.

**Gym:** The complaint alleges that the IDOC refuses to allow mobility-impaired persons who need to use wheelchairs to attend "recreational programs in the gym with the general population" (Doc. 82). At the hearing, Plaintiff's attorney clarified that the gym is not wheelchair accessible and therefore, Plaintiff is never taken to the gym with the rest of the general population inmates.

The only grievances that mention the denial of access to the gym are the grievances dated May 30, 2017 and June 30, 2017, neither of which was fully exhausted until after Plaintiff filed this lawsuit. Consequently, this issue was *not* exhausted.

**Yard:** The complaint alleges that during yard time, "the IDOC policy is to take the Plaintiffs outside to a table, then take their wheelchairs back into the facility. As a consequence, the Plaintiffs must remain stationary for three hours, without reasonable bathroom access. The Plaintiffs are made to either urinate on themselves or yell to the tower for assistance to the restroom. Further, the Plaintiffs are not allowed to use the phones during yard time because of the lack of mobility to reach the phones" (Doc. 82).

Some of the grievances described above include complaints that Plaintiff was not being allowed to go to the yard at all. However, none of them include complaints about how Plaintiff was treated once he was out on the yard or his inability to access the phones and the bathroom. Consequently, this issue was *not* exhausted prior to filing suit.

**Summer Night Yard:** Plaintiff alleges that the IDOC refuses to allow mobility-impaired persons to attend "Summer Night Yard" (Doc. 82, p. 3; *see also, e.g.,* Doc. 17-1, p. 5). The complaint did not explain what summer night yard is. However, given the separate allegations concerning "yard time," it appeared that summer night yard was something separate and distinct from regular yard time. Plaintiff's allegation regarding regular yard time is essentially that although mobility-impaired inmates are taken to the yard, they are prevented from doing anything while on the yard because their wheelchairs are taken back into the building. On the other hand, Plaintiff's allegation about summer night yard is that mobility-impaired inmates are altogether precluded from attending it because of their disabilities (Doc. 82, p. 3; *see also* Doc. 17-1, p. 5). Plaintiff's grievances also seem to suggest there is a difference between regular yard and summer night yard given that some of them simply reference "yard" (*e.g.,* Docs. 104-2, 104-5), while others specifically reference "night yard" (*e.g.,* Doc. 100-5). Given the lack of clarity, the Court asked Plaintiff's counsel at the hearing if there was a distinction between "yard" and "summer night yard." Plaintiff's counsel confirmed that yes, there is a distinction between summer night yard and regular yard, explaining summer night is an "extra third day of yard time in the summer."

In light of that confirmation, the Court concludes that the summer night yard issue was *not* exhausted before Plaintiff filed suit in August 2017. The only grievances that explicitly mention the denial of access to summer night yard are the grievances dated May 30, 2017 and June 30, 2017, and they were not fully exhausted until after Plaintiff filed this lawsuit.

Plaintiff tries to save this claim by citing to the second grievance dated April 21, 2016, the grievance dated July 11, 2016, and the grievance dated April 29, 2017 (Doc. 104, pp. 8–9). In the second grievance dated April 21, 2016, Plaintiff complains that after he was assaulted and threatened by correctional officers, he was put in a cell in the West House that he was unable to leave, which meant, amongst other things, that he "had no yard." Plaintiff states "for 35 days total I was locked down 24/7 [in his cell] and the abuse continues today" (Doc. 104-2, p. 5). This grievance suggests that the denial of yard was situational and specific to Plaintiff, perhaps a retaliatory act by the guards. The grievance cannot fairly be read to suggest a facility-wide policy or practice of refusing to allow wheelchair-bound inmates to go to the yard, let alone that the policy or practice stretched all the way into summer and covered summer night yard.

As for the July 11, 2016 grievance, even if the Court assumes it was fully exhausted, it only mentions "the yard," not "summer night yard." Again, the two are not the same thing, as confirmed by Plaintiff's counsel at the hearing.

Plaintiff admits that the April 29, 2017 grievance does not mention yard access but claims that this grievance nevertheless encompasses yard access because the grievance officer mentioned in his response that Plaintiff has a "may go to yard permit" (Doc. 104, p. 8). The Court disagrees. The grievance cannot be read that broadly. The grievance officer only mentioned the "may go to yard" permit, as well as Plaintiff's permits for low gallery, low bunk, and feed in cell, to illustrate the accommodations that had been made for Plaintiff even though he was not on ADA status.

**MP3 Player Kiosks:** The complaint alleges that there are only two areas at the prison—the gym and the commissary—where inmates at Menard may download music and send text messages to their family, friends, and attorneys from MP3 players that the inmates can purchase (Doc. 82). Neither the gym nor the commissary are wheelchair accessible, however.

The only grievance that mentions the denial of access to the kiosks for using an MP3 player is the grievance dated May 30, 2017, and it was not fully exhausted until after Plaintiff filed this lawsuit. Consequently, this issue was *not* exhausted before Plaintiff filed suit in August 2017.

Plaintiff makes one final argument that the fact that the issues regarding lack of access to the cafeteria, programs, the gym, summer night yard, and the MP3 player kiosk were only mentioned in the grievances that were not exhausted prior to suit should not be fatal (Doc. 104, p. 6). According to him, the five exhausted grievances "deal with the same issues as the grievances not exhausted as of August 10, 2017," which is that he was deprived of access to food, programs, and services because of his disability (*Id.*). According to him, the fully exhausted grievances were therefore sufficient to put the prison on notice of its discriminatory policies and practices, even if Plaintiff did not call out those specific policies and practices in the grievances (Doc. 104, pp. 6–9). In other words, the fully exhausted grievances are general enough to encompass all of his claims.

The Court disagrees; the fully exhausted grievances cannot be read that broadly. Each of the fully exhausted grievances was fairly specific and pertained to a particular time period or a particular ADA violation. Prison officials had no reason to think that

Page 15 of 17

Plaintiff was challenging a general system-wide deprivation of rights to disabled inmates, and the prison's responses to Plaintiff's grievances demonstrate they never recognized the grievances as asserting such a claim. Furthermore, the complaints in the exhausted grievances are substantively different than the claims in the complaint. For example, Plaintiff alleged in the complaint that disabled inmates are required to eat their meals in their cell as opposed to the cafeteria like non-disabled inmates; this is a challenge to the nature of the policy itself. On the other hand, he complained in his grievances that meal trays were not being brought to his cell, which is a complaint that the policy was not being followed. It is the difference between being denied food completely and opposing the location at which your food is served. A grievance about the first cannot be read to encompass the second. *See Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013) ("Separate complaints about particular incidents are . . . required if the underlying facts or the complaints are different."); 20 ILL. ADMIN. CODE § 504.810(b) (2017) (requiring grievances to "contain factual details regarding each aspect of the offender's complaint . . . ."); 20 ILL. ADMIN. CODE § 504.810(b) (2003) (same).

In conclusion, the Court finds that Plaintiff failed to properly exhaust his claims that the IDOC violated the ADA by denying mobility-impaired inmates access to the cafeteria, school and educational programs, phones and bathrooms while on the yard, summer night yard, and MP3 player kiosks. However, he fully exhausted his claim that the IDOC violated the ADA by not allowing disabled inmates to make use of walking assistive devices.

## CONCLUSION

The Motion for Summary Judgment on the Issue of Exhaustion filed by Defendants John Baldwin and the Illinois Department of Corrections (Doc. 99) is **GRANTED in part and DENIED in part.** It is granted as to Plaintiff's claims that the IDOC violated the ADA by denying mobility-impaired inmates access to the cafeteria, school and educational programs, phones and bathrooms while on the yard, summer night yard, and MP3 player kiosks. The motion for summary judgment is denied as to Plaintiff's claims that the IDOC violated the ADA by not allowing disabled inmates to have assistive devices. Plaintiff exhausted this claim and, as such, this matter will proceed on this claim only.

A status conference will be set by separate order to discuss the schedule in this case.

**IT IS SO ORDERED.**

**DATED: July 8, 2020**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**
