IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SCOTT PETERS, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | )   Case No. 3:17-CV-00852-MAB |
| | ) |
| JOHN BALDWIN, ET AL., | ) |
| | ) |
|     Defendants. | ) |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on the Defendants' motion for summary judgment (Doc. 140). Plaintiff, Scott Peters ("Plaintiff"), through his recruited counsel, has filed a response in opposition to the motion for summary judgment (Doc. 146). The Defendants (Rob Jeffreys[1] and the Illinois Department of Corrections) did not file a reply brief or otherwise respond to the arguments advanced by Plaintiff. For the reasons outlined below, Defendants' motion for summary judgment will be denied.

### PROCEDURAL BACKGROUND

Plaintiff Scott Peters is an inmate in the Illinois Department of Corrections ("IDOC"), currently confined at Menard Correctional Center. While the procedural history in this case is long, most of it is unnecessary for the Court to recount here. Plaintiff

---

[1] The Director of the Illinois Department of Corrections at the time this case was filed was John Baldwin. The current Director is Rob Jeffreys. The Director was named as a Defendant in this case for the purpose of injunctive relief. Although neither party addresses this issue in their summary judgment briefing, the Court believes Plaintiff's claim for injunctive relief is likely now moot. However, the Court will hold off on dismissing the Director as a Defendant in this case until speaking with the parties at a status conference.

filed this lawsuit on August 10, 2017, alleging that the IDOC deprived disabled "ADA inmates" who are confined to wheelchairs from participating in certain programs, activities, and opportunities that are available to inmates who are not disabled (Doc. 1, Doc. 7). On March 6, 2019, this case was consolidated with another case Plaintiff had pending in this district involving similar allegations and claims (*See* Doc. 76). The Court ordered Plaintiff to filed a consolidated complaint, which Plaintiff did through his recruited counsel (*See* Doc. 82).

After briefing and a hearing on the issue of exhaustion, the Court ultimately determined that Plaintiff had only exhausted one claim against the IDOC and the Director of the IDOC (now Rob Jeffreys) that it violated the ADA by not allowing disabled inmates to have assistive devices (Doc. 114). At some point after the Court's ruling on exhaustion, Plaintiff opted not to pursue this case as a class action and instead decided to pursue this as simply an individual action (Doc. 136, p. 2).

## Factual Background

Prior to his incarceration, Plaintiff served for six years in the United States Military (Doc. 1401-1, p. 4). Following his honorable discharge, Plaintiff worked a variety of different jobs and then worked as an assistant owner of a maintenance company for 23 years (Doc. 140-1, p. 4).The job duties at this maintenance company, as Plaintiff described them, were largely sedentary (Doc. 140-1, pp. 4-5). At some point prior to his incarceration, Plaintiff applied for Social Security Disability, but was incarcerated before the process was completed and he was ultimately denied benefits (Doc. 1401-1, pp. 4-5).

Plaintiff testified that dating as far back as 2006, he was experiencing difficulties in ambulating (Doc. 141-1, p. 12). Sometime between 2010 and 2013, Plaintiff testified that he broke his left leg (Doc. 141-1, pp. 9-10, 12). When asked to discuss his mobility and medical treatment prior to his incarceration, Plaintiff testified that he participated in physical therapy for a short period of time, but says that it was discontinued because it was not "beneficial." (Doc. 140-1, p. 12). Plaintiff, however, does not specify who determined that the physical therapy would not be beneficial. He testified that he used a variety of assistive devices (at different times) to help him ambulate, including one or two crutches (including a wooden crutch he made himself at one point), a cane, a wheelchair, and a scooter (Doc. 140-1, pp. 12-13). Plaintiff indicated that he started using a cane "a long time" ago, but could not remember if a doctor originally recommended it (Doc. 140-1, p. 11). He also testified that there was a physician who recommended a walker to him at some point in time, but the walker was problematic for him because he could not pick it up and move it (Doc. 140-1, p. 13). When he would go to places like the grocery store or Wal-Mart, for example, Plaintiff would use a motorized scooter to move about the store (Doc. 140-1, p. 13). He also described going to an amusement park where he was provided a wheelchair to move about the park Doc. 140-1, p. 15). Plaintiff indicated that when he lived in his home prior to incarceration, he kept multiple assistive devices around the house (including a wheelchair) and that he would go up and down the stairs in his home on his bottom (Doc. 140-1, p. 13).

On June 26, 2015, Plaintiff arrived at Stateville Correctional Center. While at Stateville, Plaintiff testified that he had accommodations and permits, and was under the

impression that he still had a permit for an assistive device when he arrived at Menard (Doc. 140-1, p. 15). Plaintiff's medical records indicate he had a temporary permit from the North Reception Center ("NRC") at Stateville for one gallery, low bunk, and two crutches from July 24, 2015 that was valid for thirty (30) days (Doc. 140-5, p. 320). Prior to this temporary permit, Plaintiff was assessed as requiring a wheelchair and two crutches for his use from the date of his arrival at Stateville (which was 28 days prior to this temporary permit) (Doc. 146-3, p. 2). Plaintiff was issued additional permits after the July 24, 2015 permit on December 31, 2015 and August 27, 2016 (Doc. 146-3).

Additionally, Plaintiff sought medical care at Stateville in December 2015 for falling on the stairs (Doc. 140-5, p. 23-24). Upon discharge from the infirmary at Stateville on December 16, 2015, he was prescribed crutches and a wheelchair for 30 days. (Doc. 140-5, p. 55). Initially, Plaintiff refused transport back to the NRC because he was unable to climb into the vehicle since there was nothing to hold onto (Doc. 146-3, p. 55). Plaintiff was taken back to the NRC on December 18, 2015 (Doc. 140-5, p. 58).

In January 2016, while he was at NRC, Plaintiff was informed he would have to give up his wheelchair and would be given one crutch during a visit to the health care unit (Doc. 140-5, p. 59). Plaintiff says this contradicted his infirmary discharge orders of December 16, 2105, which indicated he should have a wheelchair and two crutches for 30 days (Doc. 146-3, p. 58). On January 7, 2016, Plaintiff refused transport, therefore, the medical provider allowed him to have a wheelchair to take him up to the transfer bus, receive assistance up the steps of the bus, and recommended he follow up with the onsite provider at his parent facility (Doc. 140-5, pp. 61-62).

On January 13, 2016, the Stateville medical provider noted Plaintiff's x-rays were "unremarkable," Plaintiff refused to stand, was "witnessed weight bearing and use of right arm by staff," but then it was determined he may have crutches during transport. (Doc. 140-5, p. 63). The provider tried to encourage him to increase his activity to promote his health and Plaintiff said in an "angry raised voice, 'even when I get there I won't move around.'" (*Id.*). He appeared so angry, the provider ended the clinic visit for "safety reasons." (*Id.*).

Plaintiff was given permits for assistive devices for transport (Doc. 140-5, pp. 61-63). When he arrived at Menard on March 11 2016, the nurse noted he should be placed in the general medicine clinic and on the doctor call line for consideration of permits. (Doc. 140-5, pp. 66-67).

At Menard, Plaintiff first lived in the North 2 cellhouse from March 11 until March 22, 2016 (Doc. 146-2). He then lived in the West cellhouse from March 22 until April 5 (Doc. 146-2). And then he moved to the healthcare unit for nine days until April 14, 2016 (Doc. 146-2). After Plaintiff left the health care unit, he was moved to South Lowers (Doc. 140-1, p. 7; 146-2, p. 2). Plaintiff stayed in South Lowers from approximately April 2016 to October 2018 before he was moved to the Medium Security Unit at Menard (Doc. 140-1, p. 7). It was at South Lowers in April 2016 when Plaintiff says he began to repeatedly request a wheelchair (Doc. 146-1, p. 37). Plaintiff says that he requested a wheelchair through repeated grievances, kites, and informal requests to the ADA coordinator every time he would see her in the hallway (Doc. 146-1, p. 37; Doc. 146-6).

During his deposition, Plaintiff testified that in 2016, he was having a host of problems including with his spine, pelvis, and everything in the middle of his body to his knees (Doc. 140-1, pp. 9-10). He also specifically described experiencing problems with his sacroiliac joints (Doc. 140-1, p. 9). Plaintiff noted problems and pain with his lower left leg and ankle, which is the leg he broke sometime between 2010-2013 (Doc. 140-1, pp. 9-10). Plaintiff testified that he could bear "some weight" on his left side, but then later said that he cannot stand up and cannot put that kind of weight on his left leg (Doc. 140-1, p. 9). Plaintiff also said the pain he experienced prevented him from standing, sleeping, and sometimes moving at all. (Doc. 140-1, p. 22). He also complained of pain along his right side as extending from the ball of his foot all the way up through his spine (Doc. 140-1, pp. 8-10). According to Plaintiff, the pain on the right side is attributable to nerve pain or nerve damage (Doc. 140-1, pp. 10-11). Plaintiff testified the pain was constant and worsened when he would lay down on his right side (Doc. 140-1, p. 10). He also indicated that he cannot stand at all because the pain in the sacroiliac joints becomes unbearable and that he attempts to change positions frequently (Doc. 140-1, pp. 9-10).

At Menard, Plaintiff saw a medical provider on April 6, 2016. (Doc. 140-5, p. 69). The medical provider noted Plaintiff "reportedly could not ambulate," so he admitted Plaintiff to the infirmary for observation and evaluation (140-1, p. 7; 140-5, p. 69). Plaintiff saw the medical provider again on April 13, 2016, and reported a history of a pelvic fracture and spinal disease that prevented him from ambulating (Doc. 140-5, p. 72). The medical provider ordered x-rays of Plaintiff, but recorded in the medical notes that he

refused to be x-rayed (Doc. 140-5, p. 71). Plaintiff, however, disputes that he refused to be x-rayed (Doc. 146-1, p. 28).

Plaintiff was then discharged from the infirmary on April 14, 2016, and was moved to the South Lowers cellhouse rather than back to the West cell house. (Doc. 140-1, p. 7; 140-5, p. 75; 140-2). Once at the South Lowers, Plaintiff began to complain about his mobility issues and that it was preventing him from participating in activities at the facility (the grievances indicate that IDOC disputes this, factually) (*See e.g.*, Doc. 146-6, pp. 16-18). Plaintiff agreed to blood work on May 19, 2016, and saw a nurse practitioner for further evaluation of his ambulatory needs on May 31, 2016. (Doc. 140-5, pp. 76-77). The nurse practitioner also ordered x-rays, and Plaintiff complied on June 3, 2016. (Doc. 140-5, p. 78).

As of June 9, 2016, Plaintiff was given a permit to lay in/feed in his cell, which would allow him to receive his meals and any other items without leaving his cell. (Doc. 140-5, p.78; 140-1, pp. 27-28). The permit was good for two weeks; until June 23, 2016 (Doc. 140-5, p. 78).

On June 27, 2016, Plaintiff received an additional permit for low gallery, feed in cell, shower on gallery, may go to yard, which was valid through December 27, 2016. (Doc. 140-5, p. 333; Doc. 140-1, p. 28). This same permit was renewed by a medical provider on February 2, 2017. (Doc. 140-5, p. 334, Doc. 140-1, pp. 28-29).

On October 26, 2017, a medical provider renewed Plaintiff's medical permit and added to the feed in cell, shower on gallery, may go to yard, low gallery permit with the additional provisions of lower bunk, may have thick mattress, may have wheelchair for

transport, with ADA written after it (Doc. 140-5, p. 335; Doc. 140-1, p. 14, 29, 32). Initially, this permit was good through October 26, 2018 (Doc. 140-5, p. 335; Doc. 140-1, pp. 14-15). However, on January 15, 2018, this permit was renewed for a year, until January 15, 2019 (Doc. 140-5, p. 338).

On December 2, 2017, Plaintiff was issued a medical permit to use a wheelchair (Doc. 140-5, p. 337; Doc. 140-1, pp. 14-15, 33). The permit was valid through December 2, 2018. Written on the permit was a notation that it was only for the purpose of adding a wheelchair and that it did not supersede any other permits (Doc. 140-5, p. 337; Doc. 140-1, pp. 14-15, 33). On February 5, 2018, Plaintiff was issued a permit for a wheelchair for all out of cell activity, including yard, valid through February 5, 2019 (Doc. 140-5, p. 339).

Angela Crain worked as the ADA coordinator or assistant back up ADA coordinator at Menard from 2013 through February 2016 and then again from March 2017 through December 2019. (Doc. 140-3, p. 3). Ms. Crain testified that individuals at Menard with difficulties ambulating may be prescribed an assistive device, such as a cane, or crutch, or wheelchair, or may be accommodated by not having to leave their cell to travel distances (Doc. 140-3, pp. 7-8). But while the policy is that prisoners can only have medical devices with a permit, Plaintiff testified he was provided with a wheelchair, at times, when he did not have a permit (Doc. 146-1, p. 32). Plaintiff testified that even before he ever had a permit to use a wheelchair, that IDOC moved him using a wheelchair (Doc. 140-1, p. 32). Plaintiff emphasized that this was not an occasional occurrence, but that every time IDOC opted to move him out of his cell in 2016, it utilized a wheelchair to transport him despite not having a permit for a wheelchair (Doc. 140-1, p. 32).

## DISCUSSION

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court may not "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). Instead, "it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen,* 763 F.3d at 836.

Both the Americans with Disabilities Act and the Rehabilitation Act prohibit discrimination against the disabled. *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014); 42 U.S.C. §12132; 29 U.S.C. § 794(a). Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehab Act similarly provides "No otherwise qualified

individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity." 29 U.S.C. § 794(a). Because the two statutes, as well as the federal regulations implementing them, are "materially identical," they are interpreted and applied in a consistent manner. *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018) (citing *Steimel v. Wernert*, 823 F.3d 902, 909 (7th Cir. 2016)).[2]

To succeed on his claim of disability discrimination, Plaintiff must prove three basic elements: (1) he was a qualified individual with a disability; (2) he was excluded from or denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination; and (3) the exclusion, denial of benefits, or discrimination was because of his disability. *P.F. by A.F. v. Taylor*, 914 F.3d 467, 471 (7th Cir. 2019); *Lacy v. Cook Cty., Illinois*, 897 F.3d 847, 853 (7th Cir. 2018) (quoting *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996)).

### A. Plaintiff is a qualified individual with a disability for the purpose of summary judgment

Defendants' motion for summary judgment first discusses Plaintiff's pain and injuries with skepticism and contends that it is questionable whether "plaintiff even has a serious medical condition that qualifies as a disability." (*See* Doc. 140, p. 12). But the next page, Defendants confusingly do an about-face and concede for the purpose of

---

[2] The only notable difference is that the Rehabilitation Act includes as an additional requirement the receipt of federal funds, but this element is incontrovertible because all states accept it for their prisons. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015); *Jaros v. Illinois Dep't of Corr.*, 685 F.3d 667, 671–72 (7th Cir. 2012).

summary judgment that IDOC treated Plaintiff as a qualified individual with a disability (*See* Doc. 140, p. 13). Its unclear to the Court why Defendants dedicated several paragraphs to arguing one point (*i.e.*, that Plaintiff did not have a disability) only to concede it shortly thereafter (Doc. 140, pp. 12-13). In any event, the Court need not devote further discussion to whether Plaintiff was a qualified individual with a disability as IDOC has conceded it for the purpose of summary judgment.

**B. There are material issues of fact that prevent judgment as a matter of law as to whether Plaintiff was denied the benefit of services, programs, or activities because of his disability**

This brings the Court to the next consideration: whether Plaintiff was excluded from or denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination because of his disability. Specifically, the Court must consider whether Plaintiff was denied access to assistive devices that forced him to crawl about his cell and prevented him from access to a shower, toilet, and bed on the same basis as non-disabled inmates.

It is well-established that the IDOC is a public entity within the meaning of the ADA and has always been subject to the nondiscrimination and accessibility requirements of Title II. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (per curiam). Title II of the ADA does not explicitly define "services, programs, or activities." *Ashby v. Warrick Cnty. Sch. Corp.*, 908 F.3d 225, 231 (7th Cir. 2018). The implementing regulations interpret the term broadly, however: Title II applies "to all services, programs, and activities provided or made available by public entities" and

"anything a public entity does." *Id.* (quoting 28 C.F.R. § 35.102; *id.* pt. 35, app. B). Although the Seventh Circuit has explained that "[r]efusing to make reasonable accommodations is tantamount to denying access," *Jaros*, 684 F.3d at 672, it does not appear that every refusal to accommodate effectuates a denial. A mere "inconvenience"—even one stemming from the refusal to provide a requested accommodation—does not amount to a denial of access. *See Shuhaiber*, 980 F.3d at 1170 (quoting *Wagoner*, 778 F.3d at 593).11 The line between a mere inconvenience and a more serious denial of access is not a bright one. The Seventh Circuit has therefore held (under the materially identical Rehabilitation Act) that state prisons cannot deny prisoners access to "recreation," *Norfleet v. Walker*, 684 F.3d 688, 690 (7th Cir. 2012), or "meals and showers." *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012).

Defendants spend a great deal of this argument section of their brief essentially rehashing the facts and elaborating on their statement of facts (*see* Doc. 140, pp. 14-19). Its not until page 19 (out of 20) that the Court can discern a few legal arguments.[3] As best the Court can tell, Defendants advance three arguments in support of summary judgment

---

[3] The Memorandum is 22 pages in length, however, the 21st page is simply the "Wherfore" clause and signature block and the 22nd page is the Certificate of Service (*See* Doc. 140). The "Argument" section of the brief begins on page 11 and contains two subsections (See Doc. 140, pp. 11, 14). The first section is dedicated to the issue of whether Plaintiff is a qualified individual with a disability, which the Defendants ultimately concede, but only after a few pages of confusing argument to the contrary (*See* Doc. 140, pp. 11-13). The Defendants then spend the next five pages rehashing facts (*See* Doc. 140, p. 14-18). Its as if the legal arguments in Defendants' memorandum are completely an afterthought (*See* Doc. 140, p. 19-20). And its not the Court's role to take these few cursory arguments and develop or advance them further or to spot other arguments the Defendants could have made but failed to make and develop them. *See Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel."); *Luddington v. Indiana Bell Tel. Co.*, 966 F.2d 225, 230 (7th Cir. 1992) ("The responsibility for the identification, framing, and argument of the issues . . . is that of the lawyers, not that of the judges.").

throughout these two pages. They say they cannot be liable because the IDOC complied with the medical permits issued to Plaintiff[4]; that Plaintiff's claim is really just a complaint over the treatment of his medical condition rather than an ADA claim; and finally that this case is comparable to a recent Seventh Circuit decision (*Shuhaiber v. Illinois Dept' of Corrections*) that affirmed the dismissal of an ADA claim, which Defendants say is analogous. The Court will address each of these in turn.

In claiming that it complied with the medical permits issued to Plaintiff, Defendants say that the IDOC provided Plaintiff permits for low gallery, feed in cell, shower on gallery, may go to yard, low bunk, thick mattress, and may have wheelchair for transport (*See* Doc. 140, p. 17). Additionally, Defendants point to the fact that Plaintiff ultimately received a permit for a wheelchair for all out of cell activity, including yard (this was not until 2017 though). According to the Defendants, Plaintiff was never prescribed a wheelchair inside of his cell and therefore was not placed in a wheelchair accessible cell (*See* Doc. 140, p. 18). But even so, IDOC offers no authority to show how this means it met its obligation under the ADA, given the facts Plaintiff has developed in this case regarding his documented mobility issues. Plaintiff also disputes that Menard acted consistently regarding the medical permits. According to Plaintiff, even when he had permits for lay in cell/feed in cell, for example, IDOC officials moved him from his cell using a wheelchair when they opted to move him (despite his lack of a permit for one). Moreover, Defendants never squarely address the fact that Plaintiff has testified he

---

[4] Defendants did not offer a single legal citation to support this argument.

was denied access to move about his cell and the facility, and to the shower and toilet on the same basis as non-disabled inmates even in spite of the medical permits provided.

Plaintiff offered evidence that the internal policy/practice Defendants seem to rely on to support its reasonable accommodation argument was not consistently practiced and applied at Menard (*See* Doc. 146, p. 19). For example, Plaintiff pointed to the fact that even before he had a permit for a wheelchair, he was transported from his cell by way of a wheelchair. This, of course, was only when the IDOC chose to move Plaintiff. Otherwise, according to Plaintiff, he was unable to leave his cell or move about freely. Defendants never filed a reply brief to contest this point. And a policy can only qualify as a "reasonable accommodation" if it is "consistently practiced." *See Lacy v. Dart*, 2015 WL 5921810, at *11 (N.D. Ill. Oct. 8, 2015). Plaintiff offered evidence regarding the inconsistent application of Menard's policy regarding assistive devices, which Defendants did not contest, and this is likewise sufficient to defeat this argument.

Next, Defendants argue that this case is really about negligent or incompetent treatment of a disability and a claim like Plaintiff's is foreclosed by *Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996). But the Court does not see it that way as *Bryant* is readily distinguishable. In *Bryant*, the plaintiff (a paraplegic) complained that the prison refused his request for guardrails on his bed and as a result of this refusal, he broke his leg when he had a leg spasm that caused him to fall out of bed. *Id.* at 247. But the critical flaw with the plaintiff's case in *Bryant* was that he did not identify any service, program, or activity he was deprived of as a result of his disability. *Id.* at 249. In so doing, the Court of Appeals made clear that this is essential – there must be a program, service, or activity the plaintiff

was excluded from or deprived of – and he cannot simply say that his "incarceration" is different because of his disability because "incarceration" is not a program or activity. *Id*.

Finally, the IDOC points this Court to the Seventh Circuit's decision in *Shuhaiber v. Illinois Dep't of Corr.*, 980 F.3d 1167 (7th Cir. 2020), claiming that this case supports its position that summary judgment is appropriate. But as Plaintiff correctly points out in his response, *Shuhaiber* is also distinguishable from the instant case. In *Shuhaiber*, the plaintiff alleged that the IDOC failed to accommodate his disability by confining him to a cell that was not suited for an inmate confined to a wheelchair. *Id*. at 1169. He noted the small size of the cell prevented easy maneuvering within the cell; that he struggled to get into his lower bunk; and that he was transported to appointments in vans that were not ADA-compliant and thus left him to depend on officers to lift him into the vehicle. *Id*.

The district court granted a 12(b)(6) motion to dismiss because the plaintiff failed to *allege* that he was deprived access to the facilities or services or deprived of a medical appointment as a result of the non-ADA compliant vehicle. The Seventh Circuit affirmed, again making clear that Plaintiff failed to *allege* anything about his ***particular circumstances*** or accommodations that kept him from accessing the services or facilities on the same basis as other inmates. *Id*. at 1170 (7th Cir. 2020) ("Although alleging difficulties with his cell, the showers, and the vans, [plaintiff] did not say anything about his particular circumstances or accommodations that kept him from accessing the Center's facilities or services on the same basis as other inmates."). Nor did the plaintiff ever attempt to amend his complaint and add these allegations, despite being invited to do so by the district court. *Id*.

In distinguishing *Shuhaiber*, Plaintiff redirects the Court back to the Seventh Circuit's decision in *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667 (7th Cir. 2012), in which the Court held that the facility's failure to accommodate the plaintiff's disability prevented him from accessing meals and showers on the same basis as other inmates and thus stated a viable claim for failure to make reasonable accommodations under the ADA. In short, it makes clear that "showers" are a "program or activity" within the meaning of the ADA. *Id. at 672*. There is also no dispute that the provision of appropriate toilet facilities is a "service, program, or activity" within the meaning of the ADA. *Id.*; *Dunmore v. Shicker*, No. 16-CV-171-MAB, 2020 WL 65057, at *13 (S.D. Ill. Jan. 7, 2020); *Clemons v. Dart*, 168 F. Supp. 3d 1060, 1066 (N.D. Ill. 2016); 28 C.F.R. § 35.102(a) (The ADA applies to "all services, programs, and activities provided or made available by public entities."); 28 C.F.R. § Pt. 35, App. B (2011) ("[T]itle II applies to anything a public entity does.").

In sum, the Defendants have simply failed to carry their burden at the summary judgment stage to show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. There are genuine disputes of material fact. And the Defendants failed to develop or advance any cogent arguments to demonstrate to the Court that they are entitled to judgment as a matter of law. Summary judgment must be denied.

## CONCLUSION

For the reasons explained in this Memorandum and Order, Defendants' motion for summary judgment (Doc. 140) is **DENIED**. This case will be set for a status conference

by separate notice to discuss the scheduling of a settlement conference or a referral to mediation and a trial setting.

**IT IS SO ORDERED.**

**DATED: March 2, 2023**

/s/ Mark A. Beatty
MARK A. BEATTY
United States Magistrate Judge